UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE JPMORGAN CHASE & CO. SHAREHOLDER  :
DERIVATIVE LITIGATION                   :           MASTER FILE
                                        :        08 Civ. 974 (DLC)
This Document Relates to:               :
                                        :        OPINION AND ORDER
ALL ACTIONS                             :
                                        :
----------------------------------------X

Appearances:

For Plaintiff Robert L. Garber
Deborah Clark-Weintraub
Joe R. Whatley, Jr.
Whatley, Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036

For Nominal Defendant JPMorgan Chase & Co. and Defendants James
Dimon et al.:
Sharon L. Nelles
Gerald Leroy Black, Jr.
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

DENISE COTE, District Judge:

On August 15, 2008, nominal defendant JPMorgan Chase & Co.

("JPMorgan") and several of its officers and directors

(collectively, "Defendants") moved to dismiss this consolidated

shareholder derivative action pursuant to Rule 23.1, Fed. R.

Civ. P. Defendants argue, in sum, that plaintiff Robert L.

Garber ("Garber") -- the sole remaining plaintiff in this action

-- "does not fairly and adequately represent the interests of

shareholders" of JPMorgan, and therefore "may not . . .

maintain" this derivative action. Rule 23.1(a), Fed. R. Civ. P.

For the following reasons, the motion to dismiss is granted.

BACKGROUND

I.  PRELIMINARY PROCEEDINGS

Garber is the second plaintiff who has sought to pursue this derivative litigation in federal court, and he is now represented by his third set of attorneys. To assess properly the merits of this motion to dismiss, it is necessary to describe the chain of events which led the first plaintiff and Garber's prior counsel to withdraw from this litigation.

On January 30, 2008, two identical shareholder derivative complaints were filed in this district against the Defendants. The first complaint, assigned number 08 Civ. 974, was filed by Leigh Lasky ("Lasky") of the New York firm of Lasky & Rifkind, Ltd. ("Lasky & Rifkind"), and Brian J. Robbins ("Robbins"), Jeffrey P. Fink ("Fink"), George C. Aguilar ("Aguilar"), and Daniel R. Forde of the San Diego law firm of Robbins Umeda & Fink, LLP ("Robbins Umeda"), as counsel for plaintiff James R. Shroff ("Shroff"). The Shroff complaint was verified by Gregory E. Del Gaizo, a member of Robbins Umeda, who represented that he was making the verification "because plaintiff is absent from the County of San Diego where I maintain my office." The second

complaint, assigned number 08 Civ. 975, was filed solely by Lasky as counsel for Garber, and was verified by Garber.

As the docket numbers assigned to these actions indicate, the complaints were filed, in essence, simultaneously. The complaints allege, _inter alia_, that the officer and director defendants, through various acts and omissions related to the recent subprime mortgage crisis, violated the Securities Exchange Act of 1934, breached their fiduciary duties to JPMorgan, wasted corporate assets, and unjustly enriched themselves at the expense of JPMorgan and its shareholders.[1]

On April 22, 2008, counsel for the Defendants, Shroff, and Garber submitted a stipulation and proposed order consolidating these two actions.[2] Under the proposed order, Robbins Umeda

---

[1] The next day, January 31, 2008, two additional derivative complaints were filed against the Defendants in New York State Supreme Court. The complaints in these state actions -- the first filed by the New York firm Murray, Frank & Sailer LLP ("Murray Frank"), and the second filed by Murray Frank and the Dallas firm of Provost Umphrey -- are identical to the two complaints filed in this District, with the sole difference being the omission of allegations under the federal securities laws. Although Fink stated at the July 9, 2008 conference held in this action that he did not have "firsthand knowledge" of how Murray Frank obtained a copy of the complaints filed in this District, Aguilar stated that Murray Frank had contacted Robbins Umeda about derivative litigation related to JPMorgan, and Fink opined that it "would not be uncommon" for Robbins Umeda to have shared a copy of such a complaint with another firm. Fink did confirm, however, that Robbins Umeda drafted the complaints filed in this District.

[2] Garber's action, 08 Civ. 975, was initially assigned to the Honorable Robert W. Sweet. On April 25, 2008, that action was transferred to this Court as a related action.

would be named "Lead Counsel," and Lasky & Rifkind would be named "Liaison Counsel," in a consolidated action. The stipulation and proposed order, however, were not supported by submissions regarding the qualifications of Robbins Umeda to act as Lead Counsel.

A joint initial pretrial conference for the two actions was held on May 7. Fink attended on behalf of Shroff, and an attorney from Lasky & Rifkind appeared on behalf of both Shroff and Garber. At the conference, the Court asked Fink for basic biographical information about Shroff. In response, Fink indicated that he had never met Shroff, did not know how Shroff was employed, and did not know when Shroff had purchased his shares in JPMorgan. He could only report that he had spoken with Shroff by telephone, that Shroff was a long-term shareholder of JPMorgan, and that Shroff still held shares in JPMorgan (and thus had standing to maintain the derivative action). Reciting the Rule 23.1 standard -- namely, that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association" -- the Court pointed out that it would need sufficient information to find that the plaintiff and counsel in these derivative actions meet that standard. Accordingly, an Order of May 8 directed

Robbins Umeda to provide, by May 16, documentation regarding (1) its qualifications to act as Lead Counsel, and (2) Shroff's qualifications to maintain this derivative action under Rule 23.1, Fed. R. Civ. P. (A separate Order of May 8 consolidated the two actions, but did not address Robbins Umeda's application to be appointed Lead Counsel.)[3] The May 8 Order also set a schedule for further proceedings in the now-consolidated action: A consolidated complaint was to be filed on July 16, and any motion to dismiss was to be filed by August 29, 2008.[4]

On May 16, 2008, Robbins Umeda submitted a declaration from Fink regarding the firm's qualification to act as Lead Counsel, accompanied by a 35-page firm resume. In his declaration, Fink described Robbins Umeda's "extensive experience in litigating shareholder derivative cases," and noted that this expertise "has been recognized on numerous occasions by courts who have appointed us to leadership positions" in such cases.

A letter from Aguilar accompanying these submissions, however, informed the Court that "due to scheduling

---

[3] At the conference, the Court declined to appoint "Liaison Counsel," although Lasky & Rifkind was advised that local counsel could provide ministerial assistance if out-of-town Lead Counsel were appointed.

[4] Fink represented that there was and would be no demand made upon JPMorgan, and that its opposition to any motion to dismiss would not request an opportunity to make a demand. Defendants indicated that they would be making a motion to dismiss on this issue.

difficulties," Robbins Umeda was currently "unable to procure Mr. Shroff's declaration at this time," but would do so on May 21. Despite this deficiency in its May 16 submission, on May 19, Robbins Umeda submitted a new proposed order appointing (1) Robbins Umeda as Lead Counsel in the consolidated action, and (2) Shroff as "Lead Plaintiff."

By letter dated May 23, Fink changed course, indicating that Robbins Umeda no longer intended to submit a declaration from Shroff, but rather would be moving to dismiss Shroff from this action. Fink explained that "[a]fter speaking with Mr. Shroff regarding the status of the case and [Robbins Umeda's] application for appointment as Lead Plaintiff's Counsel, Mr. Shroff -- an elderly investor -- determined that he does not have the time necessary to devote to this litigation." The letter further states that Robbins Umeda would be filing a notice of appearance on behalf of Garber (previously represented solely by Lasky & Rifkind), and would submit a declaration from Garber supporting the firm's application to be appointed as Lead Counsel.

That same day, Robbins Umeda filed a notice of appearance on behalf of Garber and a declaration from Garber stating, inter alia, that he had previously retained Robbins Umeda in three shareholder derivative actions brought between 2005 and 2008, and that he was satisfied with the quality of their

representation.  Garber added that he is a citizen of
Pennsylvania, that he owns shares of JPMorgan, and that he is
aware that JPMorgan is a Delaware corporation, but did not
otherwise identify himself or further address whether he could
fairly and adequately represent the interests of the corporation
and its shareholders.

The submissions and representations made by Robbins Umeda
to this point raised serious concerns about the ability of
Garber and Robbins Umeda to maintain this action in keeping with
the requirements of Rule 23.1.  These concerns were intensified
when, in conducting an independent review of Robbins Umeda's
qualifications to act as Lead Counsel, the Court discovered an
opinion issued on February 4, 2008, by the Honorable Ben F.
Tennille of the Superior Court of North Carolina, Egelhof v.
Szulik, No. 04 CVS 11746, 2008 WL 352668 (N.C. Super. Ct. Feb.
4, 2008) -- an opinion unmentioned in Robbins Umeda's
submissions regarding its qualifications to serve as Lead
Counsel in this action -- indicating that Robbins Umeda's
conduct in this litigation was not without precedent.

As summarized by Judge Tennille:

This is a purported shareholder derivative action in
which the failure of counsel to communicate with their
client in violation of the Rules of Professional
Conduct, the failure of the client to communicate with
counsel in contravention of his fiduciary duties, the
needless rush to file a complaint, the filing of
defective pleadings, and the solicitation of a

7

> plaintiff unqualified to fulfill the significant
> duties of a plaintiff in a shareholder derivative
> action all converged to create a situation in which
> neither the firm nor the client fulfilled their duties
> and obligations.

Egelhof, 2008 WL 352668 at *1.  In Egelhof, as here, the

derivative complaint (against Red Hat, Inc. and its officers and

directors) was filed by local counsel, but drafted by Robbins

Umeda, who took the lead -- through Robbins, Fink, and an

associate, Steven R. Wedeking ("Wedeking") -- in representing

the plaintiff, Andrew Egelhof ("Egelhof").  As was also true in

the case before this Court, Judge Tennille found that when he

questioned Fink and Wedeking about their client, "[i]t was clear

. . . that neither of them had ever met Mr. Egelhof nor knew

anything about him.  Mr. Wedeking did not know how many shares

Mr. Egelhof owned, and Mr. Fink erroneously represented to the

Court that he owned hundreds of shares."  Id. at *2.  Having

discovered that counsel from Robbins Umeda "knew absolutely

nothing about" their ostensible client, Judge Tennille

"requested that Mr. Wedeking at least find out how many shares

of Red Hat stock his client owned.  That request obviously

prompted some inquiry which produced the information that Mr.

Egelhof was no longer a shareholder, a fact communicated to the

Court and counsel by e-mail."  Id.

As a result of Egelhof's loss of standing to maintain the

derivative action, the case was dismissed.  Defendants then

moved for attorney's fees and sanctions, in connection with which Judge Tennille ordered that Egelhof's deposition be taken. Id. That deposition -- defended by Robbins and Fink -- revealed that Egelhof did not possess "a significant ownership interest in Red Hat," or, more importantly, "the knowledge, background or experience to fulfill his fiduciary duties" as a derivative plaintiff. Id. at *4-5.[5] The deposition also made clear that "Mr. Egelhof played no significant role in the litigation process," that he "had never met Mr. Robbins or Mr. Fink until the night before his deposition related to the sanctions motion," and that he and Robbins Umeda did not communicate with one another regarding developments in the case, Egelhof's stock holdings, or even Egelhof's whereabouts. Id. at *5.

Based on this record, Judge Tennille concluded that Robbins Umeda

> treated the lawsuit as its own, made all litigation
> decisions without input from the client, and failed to
> keep the client and the Court informed of facts which
> were relevant to Mr. Egelhof's standing to pursue the
> litigation. While there is no evidence that the firm
> knew that Mr. Egelhof had sold his stock and hid that

---

[5] As described by Judge Tennille, Mr. Egelhof was a "Kansas resident [who] responded to an Internet solicitation from a California law firm looking for a plaintiff in a North Carolina action." He "was twenty-four years old, had worked in various information technology roles at Kansas State University, and had a degree in business administration," but had "little investing experience, no experience in litigation, no prior connection with the San Diego law firm, no personal knowledge of Red Hat and its operations, and a minor criminal record." Egelhof, 2008 WL 352668 at *5.

> information, it is clear that they made no effort to
> stay in touch with him and discern whether anything
> had happened which would have affected his standing.

Id. at *6. As a result of this course of conduct, Robbins Umeda

-- and Robbins and Fink specifically -- were sanctioned and,

inter alia, barred from appearing pro hac vice in the state

courts of North Carolina for five years. Id. at *7.

Having reviewed the Egelhof decision as well as Robbins

Umeda's submissions in this action, the Court issued an Order of

June 9 that (1) required the Defendants to depose Garber

regarding his qualifications to maintain this action under Rule

23.1, the history of his involvement in this litigation, and the

history of his relationship with Robbins Umeda;[6] (2) allowed the

Defendants to depose Shroff -- whose motion to be voluntarily

dismissed from this action was still pending -- on similar

subjects, and (3) directed Robbins Umeda to submit a list of

cases in which it or its members had been sanctioned in the last

ten years.[7] The June 9 Order also scheduled a conference for

July 9 to discuss these issues.

---

[6] This portion of the Order cited the Egelhof decision, as well
as a memorandum endorsed letter from Carmona v. Paulson, No. 05
Civ. 9327 (S.D.N.Y. Nov. 6, 2007), in which Robbins Umeda was
permitted to substitute Garber as "nominal shareholder
representative" in another shareholder derivative action in this
District, the same maneuver for which the firm sought the
Court's approval in this action.

[7] On behalf of his firm, Robbins submitted a letter of July 2, in
which he reported that the Egelhof decision was being appealed,
and that, "[a]fter inquiry and to the best of my knowledge and

## II.  THE SHROFF AND GARBER DEPOSITIONS AND SUBSEQUENT PROCEEDINGS

As permitted by the Order of June 9, Defendants deposed both Shroff and Garber.  At his deposition, Shroff recounted that following Robbins Umeda's representation of him in a lawsuit against a company called ESS Technology (in connection with which Shroff said he received $4,000[8]), he was "asked by a secretary to present [Robbins Umeda] with a list of [his] stocks," which he did.  Based upon this knowledge of Shroff's holdings, Robbins Umeda contacted him sometime in early 2008 about bringing a derivative lawsuit against JPMorgan.  Shroff subsequently signed an agreement with Robbins Umeda providing that the firm would represent him in a derivative action against JPMorgan.  (The agreement is dated January 28, 2008, but bears a signature from Shroff dated February 12, nearly two weeks after

---

belief, neither Robbins Umeda nor any member (or associate) of Robbins Umeda has been sanctioned during the last ten years except for the sanctions issued in the <u>Egelhof</u> case."

[8] As subsequently clarified at the July 9 conference, Shroff received this $4,000 in connection with the settlement of derivative litigation regarding ESS Technologies in California State Court.  An Order of October 1, 2007 issued by the Honorable Bonnie Sabraw approved such a payment to the three named plaintiffs in that action as "ESS's way of thanking the named [p]laintiffs for their efforts in pursuing claims on its behalf" and "to compensate the named plaintiffs . . . for assuming the responsibilities of prosecuting this action." (Shroff is not mentioned by name, but Aguilar stated that Shroff was indeed one of the three named plaintiffs.)

the complaint bearing his name was filed in this District.[9])

Although the agreement contains, _inter alia_, a short exhibit describing the "Duties of a Shareholder Representative" in a derivative action, he testified that he did not understand this document when he signed it.[10] Indeed, his testimony as a whole indicated that he was not aware of the basic nature of a shareholder derivative action,[11] and he specifically responded "No" when asked "Do you understand what a derivative lawsuit is?"

Finally, Shroff also testified that, in May 2008, he decided that he no longer wished to participate in this litigation "[b]ecause [he] didn't think the subprime rational[e] was valid"[12] -- _i.e._, because he did not think that this action had any merit -- and not because, as Fink represented in his May 23 letter, that Shroff "determined that he [did] not have the

---

[9] Shroff's verification of his complaint was also signed on February 12, and was not filed with the Court.

[10] Shroff testified that he "figured this was a follow-up" to the list of stocks he submitted.

[11] At one point, Shroff testified, "[t]his lawsuit was against JPMorgan and subprime derivatives, and for the longest time my feeling of a derivative was playing options, whether they were put or call. I had no concept what derivatives meant."

[12] Shroff testified that he reached this conclusion after speaking to the manager of a JPMorgan Chase branch that he frequented.

time necessary to devote to this litigation."[13]  Moreover,
questioning from Shroff's counsel during the deposition further
indicated that his qualms about the litigation were likely first
expressed to Robbins Umeda when Robbins called Shroff on May 15
in order to obtain Shroff's declaration in support of Robbins
Umeda's application to be appointed Lead Counsel.  Thus, it may
be assumed that Shroff's lack of desire to remain a plaintiff in
this action would not have been discovered had this Court not --
like the court in Egelhof -- directed Robbins Umeda to obtain
information from its client.

Garber's deposition, in turn, revealed that he is an
attorney in Pennsylvania with a solo practice focusing on family
law, personal injury litigation, and assorted business
litigation.[14]  Unlike Shroff's, Garber's testimony indicated
familiarity with the nature of a derivative action, as well as
knowledge of the factual basis for the instant action.  He also
stated that he currently owns 165 shares of JPMorgan stock, and
that his total investment portfolio is worth over $2 million and
contains investments in roughly 200 companies.

---

[13] Although Shroff also indicated that he did not want to have to
travel to New York to participate in the litigation, it is
apparent that the potential need for Shroff to travel did not
arise until June 9, when this Court ordered that Shroff could be
deposed, and thus after Shroff's May discussion with Robbins
indicating that he did not believe that the case had merit.

[14] Garber did state, however, that his legal practice was not his
primary means of support, but that his investments were.

He testified that his involvement in this action commenced when his friend and fellow attorney Alfred Yates ("Yates") -- to whom Garber had given on-line access to his list of stock holdings -- "made [Garber] aware" that Garber owned JPMorgan stock and that litigation against its officers and directors might be appropriate. Yates then, Garber believed, undertook an investigation, concluded that such an action "should be pursued," and conferred with Lasky regarding the filing of a complaint. As described by Garber, although he did not retain Yates as his attorney in this case,[15] "[i]t was my understanding that [Lasky] was the contact to discuss [the complaint] with Al Yates, and Al and I would discuss it."

Garber testified that while he eventually spoke to Lasky directly (by telephone), this took place after Yates had conferred with Lasky. Garber further testified that his "primary conversations" regarding this action were and have been "with . . . Al Yates," but that he would on occasion have "follow-up" conversations with Lasky or Fink.[16] Thus, for example, when Robbins Umeda wanted Garber to submit a

---

[15] Nevertheless, during the course of the deposition Garber asserted attorney-client privilege when asked about conversations between him and Yates. Garber stated that although "[i]n this specific action [Yates] is not counsel of record . . . I do consult him as a lawyer."

[16] Garber testified that he never signed a retention agreement with Lasky & Rifkind, and did not sign such an agreement with Robbins Umeda until the day of his deposition.

declaration on May 23 in support of the firm's application to be appointed Lead Counsel, "Yates brought it to [Garber's] office," he and Yates "discussed it," and Garber then signed it.

Garber also revealed that he is or has been a named plaintiff in approximately twenty-five other actions against corporations and their officers, and that Yates generally referred him to the law firms who would then initiate these actions on Garber's behalf. Garber stated that Yates also monitors Garber's stock portfolio to ensure that Garber does not sell any stock involved in a lawsuit in which Garber is a named plaintiff. Garber testified that Yates does this because they are "friends," and that he has no knowledge of any compensation that Yates receives from the firms to which he refers Garber. Garber did report, however, that he and Yates, in their respective legal practices, "handle cases . . . on a referral basis," and also "handle cases jointly."

Although Garber could recall, when prompted by questions, some of the cases in which he is or was a named plaintiff, he generally could not recall basic information about those cases, such as where they were filed, what subjects they concerned, who represents him in these actions (i.e., whether Yates or another firm is his attorney of record), or, in some instances, which corporations were involved as defendants. For example, when asked, "Have you brought a lawsuit against Macy's," Garber could

only reply, "I may have, I don't have a recollection at this time."[17]  In explaining this inability to recall basic facts about these cases, Garber explained that Yates "is the person that I go through in these cases," regardless of whether Yates is, in fact, attorney of record for Garber in a particular action.[18]

Regarding his attention to this action, Garber testified that he spent "somewhere between ten to fifteen hours" on the JPMorgan litigation, and another "ten hours or so" preparing for his deposition.  He further stated that he believed that he had been doing "what is appropriate as representative" for the shareholders by "adhering to, absorbing, following, [and] discussing advice with counsel," and that he believed that he had also done so in the other twenty-five actions in which he was involved.  When questioned, however, it appeared that he had generally not seen the orders issued in this case until the preparation for his deposition, and that he was also not specifically aware of Shroff's complaint until Yates informed

---

[17] During a subsequent portion of the deposition, Garber was shown a newspaper article discussing a class action filed in Garber's name against Macy's.

[18] Garber later clarified that he receives "about half" of his updates about his pending litigations directly from Yates.  When questioned about how he heard about specific developments in the various cases in which he is a plaintiff, however, Garber almost invariably replied that, while he did not recall specifically, he would have heard about them through Yates.

him that Shroff was seeking to be dismissed from the case. He
did state that the Court's June 9 Order was shown to him "almost
immediately" by Yates, and that they discussed it "at length,"
including the concerns raised in the Order regarding Robbins
Umeda's lack of contact with Shroff. Garber also stated that
Yates was present, along with Aguilar and Lasky, during the
preparation for his deposition.

Following the completion of the depositions, counsel for
the Defendants submitted a letter of July 3, in which they
called into question Garber's ability to represent fairly and
adequately the interests of the shareholders in this action.[19]
The letter also raised questions as to whether Garber had
properly invoked the attorney-client privilege in refusing to
answer questions concerning Yates and requested an opportunity
to depose Yates and to redepose Garber on their relationship and
conversations.

Garber's counsel replied on July 7, contending that the
deposition testimony confirmed that Garber satisfies the Rule
23.1 standard. It asserted that the attorney-client privilege
had been properly invoked by Garber and protected his

---

[19] Defendants reviewed Garber's testimony and "respectfully
submit[ted]" that that testimony was "relevant to the Court's
inquiry into whether Mr. Garber" satisfied the Rule 23.1
standard.

communications with Yates.  It opposed the application to depose Yates or to redepose Garber.

Accordingly, at the July 9 conference, the Court -- after a review of the proceedings to that point -- set a schedule for the instant Rule 23.1 motion, and stayed the previously scheduled date for the filing of the consolidated complaint. The Court expressed doubt that the attorney-client privilege had been properly invoked in response to questions exploring whether Garber could fairly and adequately represent the class, but suggested that the parties brief the motion on the basis of the record as it then stood.  Defense counsel agreed to that proposal but noted that Robbins Umeda should address in a declaration "whether there is some undisclosed relationship between Mr. Yates and [Robbins Umeda] for remuneration based on any outcome in this case."

On July 15, Aguilar wrote to the Court on behalf on Robbins Umeda, stating that "[i]t has become increasingly evident . . . that Robbins Umeda's original interest in service as lead plaintiff's counsel in this matter has led to unfortunate distractions in the litigation for the Court and the parties." Aguilar thus requested an extension of time on the briefing schedule for the Rule 23.1 motion to allow Garber to find new counsel.  That request was granted on July 16; the Order dismissing Shroff was also signed on that date.

On August 6, new counsel for Garber, from the firm of
Whatley, Drake & Kallas, LLC ("Whatley Drake"), filed a notice
of appearance, along with a Declaration Regarding the Adequacy
of Whatley Drake & Kallas, LLC to Serve as Counsel for Plaintiff
Robert L. Garber.  The declaration -- like Fink's submission of
May 16 -- recounts Whatley Drake's experience in litigating
"significant complex class action and derivative litigation,"
and is accompanied by a 30-page firm resume.  The declaration
does not mention anything about the attorney-client relationship
between Whatley Drake and either Garber or Yates.  It includes
no information on how Whatley Drake was selected to represent
Garber or whether a Whatley Drake attorney had ever met with or
spoken to Garber.

New counsel having appeared for Garber, both Lasky &
Rifkind and Robbins Umeda requested to withdraw from the action;
those requests were granted on August 8.  This motion followed
on August 15.  In opposition to the motion, Yates submitted a
declaration representing that he has not and will not receive
payment or compensation of any kind for participation in this
litigation.

DISCUSSION

When a shareholder brings a derivative action "to enforce a
right that the corporation or association may properly assert

but has failed to enforce," such an action "may not be
maintained if it appears that the plaintiff does not fairly and
adequately represent the interests of shareholders . . . who are
similarly situated in enforcing the right of the corporation."
Fed. R. Civ. P. 23.1(a).  Where a plaintiff is found to have
been an inappropriate representative of the shareholders, a
judgment entered in that derivative litigation will not preclude
a later-filed derivative action brought by a shareholder who can
fairly represent the shareholders.  As explained by the Court of
Appeals, the

>       rationale for binding nonparty stockholders by a
>       judgment in a derivative action is that a plaintiff-
>       stockholder represented their interests in that
>       litigation.  If nonparty stockholders are to be
>       conclusively bound by the results of an action
>       prosecuted by a stockholder ostensibly representing
>       their interests, however, fundamental considerations
>       of fairness and justice demand that the representation
>       be adequate.

Papilsky v. Berndt, 466 F.2d 251, 260 (2d Cir. 1972).

The requirement of fair and adequate representation is
analogous to the requirement that a representative party in a
class action must "fairly and adequately protect the interests
of the class."  Fed. R. Civ. P. 23(a)(4); see also Papilsky, 466
F.2d at 260 (stating that in derivative suit context "[o]ne of
the principal criteria for adequacy of representation is that
the representation must be of such character as to insure the
vigorous prosecution of the claim" (citing to class action

cases)); see generally 7C Charles Wright, Arthur Miller, & Mary

Kay Kane, Federal Practice and Procedure § 1833, at 147 (2007)

("Many of the factors that are considered when determining

adequacy of representation in a class action under Rule 23 also

apply in the context of derivative suits.").

In the context of class representative status, the issue of

the "adequacy of representation entails inquiry as to whether:

1) plaintiff's interests are antagonistic to the interest of

other members of the class and 2) plaintiff's attorneys are

qualified, experienced and able to conduct the litigation."

Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d

52, 60 (2d Cir. 2000) (citation omitted).  Thus, "class

representative status may properly be denied where the class

representatives have so little knowledge of and involvement in

the class action that they would be unable or unwilling to

protect the interests of the class against the possibly

competing interests of the attorneys."  Id. at 61 (citation

omitted).  The class representative's knowledge, however, need

not be extensive.  Id. (class representative's reliance on his

father and lawyer for advice did not disqualify him (citing

Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-374 (1966)).

"Inherent in any class action is the potential for

conflicting interests among the class representatives, class

counsel, and absent class members."  Maywalt v. Parker & Parsley

Petroleum Co., 67 F.3d 1072, 1077 (2d Cir. 1995). Thus, "[t]he ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." Id. at 1078. See also Baffa, 227 F.3d at 61. In the context of a derivative suit under Rule 23.1, courts have generally found that the defendant has the burden of showing that the plaintiff is an inadequate representative. See, e.g. Smallwood v. Pearl Brewing Co., 489 F.2d 579, 592 n.15 (5th Cir. 1974); see generally 7C Charles Wright, Arthur Miller, & Mary Kay Kane, Federal Practice and Procedure § 1833, at 159 (2007). But see Spira v. Nick, No. 94-cv-7066(LAK), 1997 WL 793052, at *1, *4 (S.D.N.Y. Dec. 29, 1997) (court sua sponte ordered party to show cause why action should not be dismissed for lack of adequate representation under Rule 23.1 and noted that "burden of establishing adequacy of representation in representative actions like this is on the proposed representative party").

The Defendants have shown that Garber cannot be trusted to represent the interests of the shareholders in this litigation fairly and adequately. From the start, this litigation has been controlled by counsel with absentee plaintiffs. Despite the startling record created by the proceedings to date, neither Garber nor his latest counsel of record have taken this final opportunity to provide information that would permit this Court

to conclude that Garber will indeed fulfill his responsibilities to the shareholders and the corporation.

Robbins Umeda initiated this litigation and entirely controlled it at its inception. It drafted and circulated a complaint filed in four separate lawsuits over two days purportedly by four different plaintiffs and law firms. For the lawsuit it filed as counsel of record it proffered an elderly plaintiff who understood neither the nature of a derivative action nor his duties as the named plaintiff in such litigation. It did not consult with him about critical events in the life of the case, and when it began to consult with him in response to the Court's inquiries learned that the plaintiff wanted to withdraw from the case because he doubted that it had any merit.[20] But for this Court's inquiries, this scandalous situation may never have come to light.

Robbins Umeda then tendered another plaintiff, Garber, who had been represented by Lasky as his counsel of record. This substitution replaced one problematic plaintiff with another. Garber is a professional plaintiff whose services are at the beck and call of his friend and fellow attorney Yates. Yates monitors Garber's investments and decides when Garber will serve

---

[20] Instead of disclosing Shroff's disaffection with the merits of the litigation, Robbins Umeda advised the Court that Shroff wished to withdraw because he did not have the time to serve as lead plaintiff.

as a plaintiff in derivative litigation.  Yates has made such
arrangements in at least twenty-five cases to date.  It was
Yates who contacted both Lasky and Robbins Umeda in this case.
And it is Yates who was the "conduit" -- using Garber's term --
for the information that Garber has received in this case.
Garber never even met with a Lasky & Rifkind or Robbins Umeda
lawyer regarding this litigation until the day before his court-
ordered deposition; he never signed a retainer agreement with
Lasky & Rifkind and he didn't sign a retainer agreement with
Robbins Umeda until the day of his deposition.

Yates, Robbins Umeda lawyers, and Lasky spent ten hours to
prepare Garber for his deposition in this litigation.  While
Garber demonstrated during the course of that deposition
knowledge of the issues at stake in this lawsuit and of the
duties he has purported to undertake as a named plaintiff in a
derivative action, that prepared recitation cannot erase more
telling facts.  First, Yates remains central to Garber's
participation in this litigation, and yet he has insulated
himself from scrutiny.  He is not counsel of record and his
communications with Garber are shielded by an assertion of the
attorney-client privilege.  Thus, a key decision-maker in this
litigation is beyond scrutiny by the Court.  Second, Garber does
not exert himself to become informed about the litigations in
which he serves as named plaintiff unless his performance is

being closely examined. He is appallingly ignorant of the many derivative actions that have been filed in his name. This ignorance is a fairer measure of the diligence with which he will perform his duties than the knowledge demonstrated after intensive preparation for a court-ordered deposition.

As for Whatley Drake, despite the very troubling history in this lawsuit, a lawsuit whose progress has been stymied by the search for an appropriate plaintiff and counsel to represent him, it has chosen to present virtually no information about how it came to be chosen as plaintiff's counsel in this litigation and its relationship with Garber. We know from Yates' August 21 declaration that he has conferred with Whatley Drake, but we do not know if Garber and Whatley Drake have conferred or met.[21] Given that Garber's adequacy as a plaintiff has been at issue since at least June 9, information like this should have been submitted with Whatley Drake's application to be accepted as his counsel on August 6, and should certainly have been included in its opposition to the motion to dismiss. But, perhaps tellingly, it was not. To be fair, even if Whatley Drake had proffered such basic information, it could not erase the

---

[21] Robbins Umeda represented in its July 25 letter that Garber had "identified" Whatley Drake as potential counsel for him in this litigation and that they planned to meet soon in Pittsburgh, Pennsylvania to discuss the case.

fundamental doubts that exist about Garber's adequacy to serve as a derivative action plaintiff here.

Concern over the phenomenon of the professional plaintiff has already led to statutory reform in the class action field. The findings that prompted that legislative action have resonance for derivative litigation as well. The Senate Report accompanying the Private Securities Litigation Reform Act of 1995 ("PSLRA") stated that "[a]ll too often, the same 'professional' plaintiffs appear as name plaintiffs in suit after suit" and that an explicit goal of the PSLRA was to "combat[]" such "abuses." S. Rep. No. 104-98, at 4 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 683. The Senate Report explained in detail the problem with the use of professional plaintiffs:

> Lawyers typically rely on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.

S. Rep. No. 104-98, at 6 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 685. Similarly, the House Report stated:

> Professional plaintiffs who own a nominal number of shares in a wide array of public companies permit lawyers readily to file abusive securities class action lawsuits. Floor debate in the Senate

> highlighted that many of the "world's unluckiest
> investors" repeatedly appear as lead plaintiffs in
> securities class action lawsuits. . . . These
> individuals do not adequately represent other
> shareholders . . . .

H.R. Rep. No. 104-369, at 32-33 (1995) (Conf. Rep.), <u>as
reprinted in</u> 1995 U.S.C.C.A.N. 730, 731-32.

The PSLRA was thus enacted because of Congress's belief "that the lead plaintiff -- not lawyers ---should drive the litigation. As one witness testified: 'One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then attach a plaintiff.'" S. Rep. No. 104-98, at 10 (1995), <u>as reprinted in</u> 1995 U.S.C.C.A.N. 679, 689. To that end, the PSLRA has several provisions addressing the problem of professional plaintiffs, including the rule that a "person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C.A. § 78u-4(a)(3)(B)(vi).

While this five-action/three-year rule has no counterpart for derivative actions, it is nonetheless instructive in the case of a professional plaintiff like Garber who is so demonstrably ignorant of the many lawsuits to which he has lent his name as a favor to his friend and colleague Yates. The very

abuses that led to the reform embodied by the PSLRA permeate the world of derivative litigation as well.  In both contexts there is a need to have plaintiffs who can adequately represent other shareholders and exercise a meaningful role in critical decisions such as whether to file suit or to settle.  Otherwise, it is the attorneys who will completely control the litigation and make these decisions based on their own financial interests rather than the interest of the corporation and its shareholders.  Thus, based on the entire record in this consolidated derivative litigation, the Defendants have shown that Garber should not be permitted to maintain this litigation and that it must as a result be dismissed.

In opposing this motion to dismiss, Garber's counsel has relied heavily on two court decisions.  Neither of them alters the preceding analysis and conclusion.  Garber first points to Surowitz, 383 U.S. 363, to support his argument that a plaintiff in derivative litigation need have only limited involvement and control over the litigation, and may rely on a trusted, qualified advisor.  The plaintiff in Surowitz was a Polish immigrant with limited English and little formal education.  She had relied on her well-educated and knowledgeable son-in-law in making her investment decision and later for advice about how to respond to the corporation's notice of its intent to repurchase its stock and about whether to sue the corporation in a

derivative action.  Id. at 368-70.  In response to a motion to dismiss, the son-in-law and plaintiff's attorney submitted detailed affidavits about the circumstances which led to the filing of the lawsuit.  Id. at 367-68.  After a lengthy discussion of the information revealed in those affidavits, the Court observed that the plaintiff "was not interested in anything but her own investment made with her own money," that "this is not a strike suit or anything akin to it," and that it is "not easy to conceive of anyone more in need of protection . . . than little investors like" the plaintiff, id. at 371-72, and then reversed the dismissal of the suit.

The Surowitz decision has few parallels with the Garber litigation.  Garber does not pretend to be a vulnerable plaintiff who needs the assistance of an advisor (such as a trusted and better educated relative) in addition to his attorney of record.  Nor did his advisor, Yates, submit an affidavit forthrightly disclosing his role in this litigation. To the contrary, Yates has relied on the invocation of the attorney-client privilege to shield his communications and motivations from discovery.  And, of course, Garber is a professional plaintiff.  Thus, nothing in the decision issued herein should be read as limiting the ability of uneducated or otherwise vulnerable plaintiffs to rely on relatives and close

friends to assist them in bringing and maintaining derivative litigation.

Garber's counsel next argues that in our judicial system a lawyer should take the dominant role in the litigation, citing In re Fuqua Indus., Inc. S'holder Litig., 752 A.2d 126, 135 (Del. Ch. 1999). In the eighth year of litigation, the defendants in Fuqua moved to disqualify the two named plaintiffs for their alleged unfamiliarity with the facts and allegations in the lawsuit. Id. at 127. One of the plaintiffs, Mrs. Abrams, had fallen ill during the lawsuit, and relied on her husband, who was a retired trial attorney and who had made investment decisions with her, to communicate with counsel. The second plaintiff, Mr. Freberg, had filed seven other lawsuits and his knowledge of the Fuqua litigation was described as "elliptical" at best. Id. at 128-29.

Again, the principle for which Garber cites Fuqua -- that an attorney should take the dominant role in litigation -- is not implicated by the decision to dismiss the instant action. To represent fairly and adequately the interests of other shareholders and the corporation in whose name a derivative action plaintiff has filed suit, the plaintiff need not usurp the customary role of attorneys in litigation. But, the plaintiff must be the one to authorize the suit, and must be sufficiently well informed, diligent, and independent (with the

support where necessary of appropriate advisors) to protect the
interests of the shareholders and corporation from the
potentially competing interests of the attorneys. See Baffa,
222 F.3d at 61. The Defendants have shown that Garber cannot be
relied upon to protect the interests of other shareholders and
the corporation in this manner.

CONCLUSION

The Defendants' August 15, 2008 motion to dismiss this
consolidated derivative litigation is granted.

SO ORDERED:

Dated:    New York, New York
          September 19, 2008

                                    DENISE COTE
                           United States District Judge